OPINION

HERLIHY, Judge.
A 2007 amendment to the Delaware Workers’ Compensation laws made significant revisions in the regulation of and payment for medical expenses incurred in the treatment of injured workers. Among the features established was a system for creating guidelines of allowable fees and extent of treatment. Employers and insurers could seek what that law labels “utilization review” of bills for treatment if there were a dispute over expenses incurred. That review would be available to employers and/or insurers for injuries which have been “acknowledged” as com-pensable.
Where, however, the employer disputed that an injury occurred or the extent of injury or other related injury issues, the matter went, as before, to the Industrial Accident Board. Traditionally, if the Board found there was a work related injury, it would also determine what medical expenses were reasonable and necessary. However, in some cases but not all, since the new law came into effect, the Board has, after finding there was a work-related injury, referred the determination of “reasonable and necessary” for utilization review by a person or body other than the Board.
That is what the Board did with appellant Raymond Poole’s petition for compen *312 sation due as the State of Delaware, his employer, disputed whether an injury was causally related to his job. After first finding that Poole had suffered a work-related injury and that his medical expenses were reasonable and necessary, the Board submitted the medical expenses for utilization review.
The issue of first impression in this case is whether, since the State disputed injury and did not “acknowledge” it, is it entitled to utilization review of Poole’s medical expenses, or does that function continue to reside exclusively with the Board for utilization review? The Court holds the Board in disputed injury cases retains the sole authority to determine reasonable and necessary medical expenses within the parameters of the guidelines and may not refer that issue for utilization review. The Board erred in referring Poole’s medical expenses for utilization review. Accordingly, the Board’s decision is REVERSED and REMANDED.

Procedural History

Poole filed a petition to determine compensation due. He worked at the Delaware Psychiatric Center. The State disputed that an injury occurred or that his medical situation was caused by a work injury. After a full hearing, the Board found Poole was injured at work and found his medical expenses were reasonable and necessary. But it referred Poole’s medical bills to utilization review. The State applied for such review. It also moved for reargument seeking to have the Board remove the finding of reasonable and necessary from its initial decision. The Board granted the State’s motion and removed the phrase “reasonable and necessary.”
Poole appealed to this Court the Board’s decision: (1) sending the medical expenses for utilization review; and (2) removing the phrase “reasonable and necessary.” This Court remanded the matter to the Board to answer two questions: (1) whether it was appropriate for the Board to change a substantive finding regarding the reasonableness and necessity of Poole’s medical expenses based on a motion for reargument without a hearing and presentation of additional evidence; and (2) whether it was appropriate for the Board to make a post-hearing finding on a prior decision involving the same parties after issuing a final decision? At the same time, the State moved to stay any utilization review. The Court denied that motion.
On remand, the Board’s response was that it acted appropriately in not having a hearing on the State’s reargument motion. It stated that there was no new evidence to consider and that it merely corrected its error of law. Further, the Board replied that its own Rule 21 permits it to entertain motions for reargument.
The matter is now back before this Court for disposition on the merits.

Factual Background

The State has not cross-appealed the Board’s finding that Poole suffered a work-related injury during his employment at the Delaware Psychiatric Center, nor has it cross-appealed the Board’s decision that his injuries were causally related. What is important for purposes of this opinion, however, is the extensive medical testimony each side presented to the Board.
Dr. Peter Bandera, who treated Poole, testified (by deposition) which the Board summarized as follows:
Dr. Peter Bandera, a physical medicine and rehabilitation doctor, testified at the hearing on behalf of the Claimant. In relationship to the low back injury Dr. Bandera began treating Claimant on April 21, 2010 and he reviewed the pertinent medical records. In his opinion *313 Claimant’s low back problem is related to a work incident on April 13, 2010 and Claimant is totally disabled as a result. By way of history, in April or May of 2004 Claimant was seen by his family doctor, Dr. Tucker, for back pain, with notation of his back and knees giving out. Lumbosacral spine tenderness and a negative straight leg raise test were noted. Dr. Bandera could not distinguish the note as to whether Dr. Tucker wanted to rule out degenerative joint disease or possibly a herniated nucleus pulpous. From that point until April of 2010 there are no other notations of low back pain in Claimant’s medical record. Claimant also has a history of a left shoulder injury and left total hip replacement. Dr. Bandera began treating Claimant in 2005 due to the left should injury. Dr. Bandera notes that Claimant has ongoing symptoms in relationship to this injury.
Claimant has cognitive slowing issues and, thus, he was seen by Dr. Bandera with his sister. Claimant informed Dr. Bandera that his low back pain began when he had to move heavy chairs at work. He developed radiating component. Initially he was seen by Dr. Tucker for low back tenderness. A muscle relaxant was prescribed.
Upon physical examination Claimant had a positive bilateral straight leg raising sign of 35 degrees and pain on facet loading of the lumbar spine, extending predominately at the L4 to SI levels. He had a slightly decreased ankle reflex which is a sign of radiculopathy involving the SI level. Claimant walks with a stooped, antalgic gait. Dr. Bandera diagnosed Claimant with lumbar syndrome with strain, sprain, and radiculopathy. He also wanted to rule out intervertebral disc dysfunction. A lumbar spine MRI and EMG were ordered and Claimant was placed on total disability status because he was still in significant distress due to the back pain. He was functioning extremely poorly and could not perform basic material handling.
A May 4, 2010 MRI of his low back revealed moderately severe and central spinal canal stenosis at L4-L5 and L5-Sl. There was some mild central lumbar stenosis at L2-L3 and L3-L4, and moderately severe bilateral neuroforaminal narrowing at L5-S1 and moderate neu-roforaminal narrowing at L4-5 and L2-L3 bilaterally. He also had generalized spondylitic disc bulges and degenerative facet changes throughout the lumbar spine. Essentially, Claimant has significant stenosis of the low back and facet changes in the small joints of the back. This acts like a disc herniation because the nerves are choked by stenosis which sets up a classic radiculopathy pattern. Dr. Bandera believes that these degenerative findings on MRI were present before the date of the work accident, but the mechanism of injury of the work accident was competent to cause an aggravation or exacerbation of Claimant’s underlying condition. Claimant was functioning at a high level without complaints prior to the work accident. His MRI findings warrant surgical consideration by a neurosurgeon.
A May 7, 2010 EMG was consistent with a bilateral radiculopathy involving the L5-S1 were root with acute features. There are no findings on EMG indicative of a chronic injury.
Claimant was placed in chiropractic and physical therapy with some limited medications. Claimant did not have access to other interventions, including a nerve block, which would be usual and customary. Claimant continues to be seen for ongoing low back pain with positive radi *314 ation and paresthesia. He also developed muscle spasm and guarding in the back region. By August of 2010 he noted that the therapy and medication helped him with basic functional activity at home, however, he still had problems getting up from a chair and transferring from a sit to stand position.
Dr. Bandera opines that Claimant has lumbar syndrome with sprain, strain, radicul[o]pathy, traumatic expression of lumbar stenosis and lumbar facet syndrome all related to the April of 2010 work injury. Claimant has an essentially unremarkable history for six years predating the work injury and had significant mechanism of injury, lifting heavy chairs, which comports with the positive MRI findings, his symptoms and the EMG which identified an acute radiculopathy process. Dr. Bandera testified that his billing statement showing a balance of $11,064.00, reflecting treatment from April 21, 2010 through July 21, 2010, represent reasonable, necessary and causally related medical treatment for Claimant’s work related low back injury. As far as future treatment Dr. Bandera hopes to perform an injection program and monitor Claimant’s progress. He would also like to order a functional capacity evaluation and a conditioning program.
Dr. Bandera disagrees with Employer’s expert that Claimant’s primary pain complaints were of the right hip and thigh and only minimally the lower back. Dr. Bandera notes that Claimant has reported ongoing low back pain complaints to him, with a bilateral radiating component. This complaint was confirmed many times by Claimant’s sister, his caretaker, and was corroborated by objective test results. Dr. Bandera agreed that Employer’s expert did not fully examine Claimant’s back or perform any range of motion testing.
On cross-examination Dr. Bandera agreed that Claimant and his sister told him that the work accident occurred on April 14, 2010 when Claimant was executing a lot of buffing activities and had to move old, heavy chairs. Dr. Bandera explained that Claimant was describing what he did on that day and that Claimant has cognitive slowing and this has to be taken into account when considering causation as he may not be totally focused. As far as whether it was one or several chairs that Claimant was moving, Dr. Bandera’s opinion as to causation remains the same. Claimant was seen approximately thirty times for therapy and he received relief afterward and it helped him stabilize basic activities at home.[1]
Dr. Andrew Gelman testified on behalf of the State concerning Poole’s injuries which the Board summarized this way:
Dr. Andrew Gelman, orthop[a]edic surgeon, testified by deposition at the hearing on behalf of Employer. Dr. Gelman examined claimant on August 25, 2010 and reviewed the pertinent medical records. In his opinion Claimant may have sustained a muscle strain or sprain in the work incident which has now resolved. His current pain is related to a right hip degenerative condition.
Claimant presented with complaints of pain in the left lower area, or the right iliac area, the right outer and anterior thigh, expressing that days are better than others. Based on where Claimant indicated that he experiences pain Dr. Gelman opines that it is emanating from the right hip joint which is sending some referred symptoms into the front of the right thigh. Claimant underwent a left *315 hip replacement in October of 2006 for an arthritic hip, and reported problems with his right hip until recently. Dr. Tucker’s November 23, 2009 record references the right hip being problematic, obtaining radiographs and prescribing anti-inflammatory medication. In an undated record which appears to take place in the Spring or Summer of 2004 Claimant also informed Dr. Tucker that he had pain in the back and knees which would give out.
Claimant reported that after lifting a wooden chair at work he began to note lower back pain. He was seen by Dr. Tucker on April 15, 2010 for back pain. Dr. Tucker found lumbar spine tenderness and Celebrix and Skelaxin were prescribed.
Claimant’s May 7, 2010 EMG revealed bilateral radiculopathy involving the L5, SI nerve root. The lumbar spine MRI reflected longstanding degenerative changes at several levels involving the foraminal openings of the disc where the nerves pass, with some narrowing, or stenosis. This is not unusual for a patient of Claimant’s age.
On physical examination Claimant has pain on palpation over the right hip and thigh areas with a noticeable gait antal-gia favoring the right side. He was able to move from a chair to the exam table, although he was uncomfortable with weight on the right side. He had limited range of motion of the right hip. Dr. Gelman did not appreciate significant lower back complaints when he physically lifted the lower extremity, as the focus of Claimant’s complaints were over the front of the right thigh. His lower extremity reflexes and light touch sensation were normal. He did have some complaints involving the low back or lumbar region, on the left. Dr. Gelman did not appreciate any muscle spasms. Dr. Gelman believes that the focus of Claimant’s pathology is the right hip, predominately the front aspect of the right hip and thigh area.
Dr. Gelman opines that Claimant has multilevel degenerative disc foraminal and facet disease, of the lower back. If a muscular sprain or strain occurred in April of 2010 that has probably resolved. Dr. Gelman believes [] that the work incident did not contribute, or aggravate or accelerate Claimant’s underlying degenerative disc disease. He had some issues with his lower back in the past. The MRI findings are of longstanding duration and unrelated to the April of 2010 timeframe. There is no medical basis to link whatever Claimant did in April of 2010 to the MRI findings, which are ultimately consistent with his age. Claimant has right hip pathology, probably a degenerative condition. Dr. Gel-man believes that this is the focus of his pain, and no the lumbar spine. The right hip problem is not related to the April of 2010 work incident. Claimant does not indicate any right hip injury and the medical records do not connect his right thigh and hip complaints to the work incident. It is possible for right hip pain which is due to degeneration to refer into the back region under certain conditions. Based on Claimant’s unrelated shoulder problem, degenerative spine, previous left hip replacement and current symptomatic right hip Dr. Gelman advises that Claimant work in a sedentary capacity as of August 2010. The symptomatic right hip, which is unrelated to any work incident, is the primary reason why Dr. Gelman recommends sedentary work restrictions. There are no restrictions related to his lumbar spine. Claimant is capable of performing all of the jobs on the Labor Market Survey, (“LMS”), except the crossing guard position.
*316 Dr. Gelman opines that if it is believed that Claimant had back pain from the April of 2010 incident then a month or two of treatment may have been reasonable to address a soft tissue injury, but other than that the medical treatment is not reasonable or necessary. Dr. Gel-man recommends over-the-counter Ibru-profen or Naproxen.
On cross-examination Dr. Gelman agrees that Claimant is not exaggerating or amplifying his symptoms. He explained that upon examination Claimant had pain in the right thigh and hip when he performed straight leg raise and sitting root testing. Dr. Gelman concedes that the did not perform any range of motion testing of the lower back, but explained that he did not do it because Claimant’s left hip replacement and right sided hip pain. He agrees that on Claimant’s initial examination with Dr. Bandera positive bilateral straight leg raising at thirty five degrees, and some pain on facet loading at the L4-S1 level were noted. He agrees that Dr. Band-era also found decreased range of motion in all planes of Claimant’s low back. Dr. Gelman agreed that he has not reviewed any treatment records, other than in the 2004 timeframe which reveal low back complaints until the work accident in April of 2010. Dr. Gelman suspects that Claimant had chronic symptoms, but was actively treating pertaining to other body parts. He concedes that during several visits with Dr. Tucker from 2004 until 2010 Claimant did not complain of lower back pain. He has not reviewed any other records which reveal such a complaint.
He also has not reviewed any records which reveal a complaint about right hip pain until September 23, 2009 when Claimant was seen by Dr. Tucker. Dr. Gelman does not believe that minor activities, such as moving a chair or buffing floors, would aggravate a severe degenerative condition such as Claimant’s. The literature would support major trauma as the potential for exacerbation or aggravation of a degenerative spine condition.[2]
The Board obviously accepted the testimony of Dr. Bandera due in large part to it finding Poole to be credible regarding the work activities leading to the injury and other portions of his testimony. Further, while referring Poole’s medical expenses to utilization review at the State’s request, the Board found Dr. Bandera’s treatment to be reasonable and necessary, in its initial decision, at least. That finding, of course, was later deleted from the decision at the State’s request, but it retained its directive for utilization review of the bills.

Parties’ Contentions

Poole argues that the Board erred in referring his medical bills to utilization review, particularly after the initial finding that Poole’s medical expenses were reasonable and necessary. He contends that the 2007 law does not allow for the employer to have a second chance to contest com-pensability where the employer does not, as here, acknowledge the injury as work related. The Board erred, he asserts, by confining its initial hearing to the issues of whether a work-related injury occurred and/or whether injuries are causally related and not making an award for medical expenses. Finally, he claims the Board erred in removing the “reasonable and necessary” language from its initial decision.
The State argues that by initially seeking utilization review rather than going to *317 the Board, it would waive any claims it had whether there was a work-related injury and causation. The Board, therefore, the State contends, did not err in referring Poole’s medical expenses to utilization review, or removing the phrase “reasonable and necessary” or considering its reargument motion without a hearing.

Discussion

The issue presented is purely one of statutory construction. As such this Court’s review is plenary.[3]

Statutory Construction of the Utilization Review Statute

There are various principles a court employs when interpreting a statute. It is well established in Delaware that in construing statutory language, courts attempt to determine and give effect to the legislative intent.[4] If however, the statute contains unambiguous language, the plain meaning of the terms control.[5] A statute is ambiguous if it “is reasonably susceptible of two interpretations.”[6] “Ambiguity may also be found if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.” [7]
Additionally, the Delaware Workers’ Compensation laws were passed for the benefit of employees injured on the job.[8] As such, this Court will engage in a liberal interpretation “to resolve any reasonable doubts in favor of the worker.”[9] A court must interpret a statute to avoid mischievous or absurd results.[10]
On January 17, 2007, the Governor signed what was Senate Bill 1 which became 76 Del. Laws ch. 1. The primary provisions incorporated into the Delaware Code pertinent to this case are now 19 Del. C. §§ 2322A-2322F. The initial feature in all of the changes was the establishment of the Health Care Advisory Panel whose purpose the General Assembly stated was:
(a) The General Assembly recognizes that issues related to health care in workers’ compensation require the expertise of the medical community and other health care professionals for resolution. A Health Care Advisory Panel is hereby established. The purpose of the Health Care Advisory Panel shall be to carry out the provisions of this chapter, with a diversity of perspectives, on matters relating to the provision of health care to employees pursuant to this chapter.[11]
The next important provision was that a healthcare payment system was to be developed as set out in the rest of these new laws. Again, the General Assembly stated its intent and purpose for this system:
(1) The intent of the General Assembly in authorizing a health care payment system is not to establish a “push down” system, but is instead to establish a *318 system that eliminates outlier charges and streamlines payments by creating a presumption of acceptability of charges implemented through a transparent process, involving relevant interested parties, that prospectively responds to the cost of maintaining a health care practice, eliminating cost-shifting among health care service categories and avoiding institutionalization of upward rate creep.
(2) The health care payment system shall include payment rates, instructions, guidelines, and payment guides and policies regarding application of the payment system. When completed, the payment system shall be published on the Internet at no charge to the user via a link from the Office of Workers’ Compensation website at www.delaware works.com/industrialaffairs/services/ workerscomp.shtml, or a successor website. The payment system shall also be made available in written form at the Office of Workers’ Compensation during regular business hours.[12]
Another provision in § 2322B states:
(4) Upon adoption of the health care payment system, an employer and/or insurance carrier shall pay the lesser of the rate set forth by the payment system or the health care provider’s actual charge. If an employer or insurance carrier contracts with a provider for the purpose of providing services under this chapter, the rate negotiated in any such contract shall prevail.[13]
In addition, there were to be guidelines for health care treatment and procedures performed outside of Delaware,[14] separate service categories for ambulatory surgical treatment centers,[15] hospital fees,[16] and much more. The initial payment system was to be created by the Health Care Advisory Panel but thereafter it was to be updated by the Department of Labor.[17]
The next new section contains provisions especially pertinent to this case:
Health care practice guidelines shall be developed in accordance with the following provisions:
(1) The Health Care Advisory Panel shall adopt and recommend a coordinated set of health care practice guidelines and associated procedures to guide utilization of health care treatments in workers’ compensation, including but not limited to care provided for the treatment of employees by or under the supervision of a licensed health care provider, prescription drug utilization, inpatient hospitalization and length of stay, diagnostic testing, physical therapy, chiropractic care and palliative care. The health care practice guidelines shall apply to all treatments provided after the effective date of the regulation referred to in paragraph (7) of this section, regardless of the date of injury.
(2) The guidelines shall be, to the extent permitted by the most current medical science or other applicable science, based on well-documented scientific research concerning efficacious treatment for injuries and occupational disease. To the extent that well-documented scientific research concerning efficacious treatment is not available at the time of adoption or revision of the guidelines, the guidelines shall be based upon the best available information concerning *319 national consensus regarding best health care practices in the relevant health care community.
(B) The guidelines shall, to the extent practical consistent with this section, address treatment of those physical conditions which occur with the greatest frequency (for services compensable under this chapter), or which require the most expensive treatments (for services com-pensable under this chapter), based upon currently available Delaware data.
(4) The guidelines shall contain a section guiding the utilization of prescription medications.
(5) The original health care practice guidelines may be based upon an existing model, already in use, to guide treatment of medical care for workers’ compensation. Additional guidelines may be initially adopted, pursuant to the same criteria, to obtain coverage of areas or issues of treatment not included in other adopted guidelines. In no event shall multiple guidelines covering the same aspects of the same medical condition be simultaneously in force.
(6) Services rendered by any health care provider certified to provide treatment services for employees shall be presumed, in the absence of contrary evidence, to be reasonable and necessary if such services conform to the most current version of the Delaware health care practice guidelines. Services provided by health care providers that are not certified shall not be presumed reasonable and necessary unless such services are preauthorized by the employer or insurance carrier, subject to the exception set forth in § 2322D(b) of this title. It is intended that these guidelines will be produced by Health Care Advisory Panel subcommittees in coordination with a qualified contractor with expertise in establishing treatment guidelines, developing the rules that define the use of such guidelines, and disseminating the guidelines in a manner that streamlines the delivery of health care.
(7)Subject to the foregoing provisions, after receiving the approval and recommendation of the Health Care Advisory Panel, the guidelines shall be adopted by regulation of the Department of Labor pursuant to Chapter 101 of Title 29. Such regulations shall be adopted and effective not later than 1 year after the first meeting of the Health Care Advisory Panel. Health care practice guidelines shall be subject to review and revision by the Health Care Advisory Panel on at least an annual basis. It is the intent of the General Assembly that the development of health care guidelines will be directed by a predominantly medical or other health professional panel, recognizing that health care professionals are best equipped to determine appropriate treatment. It is further intended that subcommittees comprised of representatives from appropriate specialties will make comment and offer recommendations to the Health Care Advisory Panel.[18]
As noted above, there are two kinds of healthcare providers, those who are certified and those who are not. Section 2322D specifies the qualifications for a healthcare provider to become certified.
It is the provisions in the next section of the new law, § 2322F, which are at the crux of this appeal. Those provisions are:
(a) Charges for medical evaluation, treatment and therapy, including all drugs, supplies, tests and associated chargeable items and events, shall be *320 submitted to the employer or insurance carrier along with a bill or invoice for such charges, accompanied by records or notes, concerning the treatment or services submitted for payment, documenting the employee’s condition and the appropriateness of the evaluation, treatment or therapy, with reference to the health care practice guidelines adopted pursuant to § 2322C of this title, or documenting the preauthorization of such evaluation, treatment or therapy. The initial copy of the supporting notes or records shall be produced without separate or additional charge to the employer, insurance carrier or employee, (b) Charges for hospital services and items supplied by a hospital, including all drugs, supplies, tests and associated chargeable items and events, shall be submitted to the employer or insurance carrier along with a bill or invoice which shall be documented in a nationally recognized uniform billing code , format, in sufficient detail to document the services or items provided, and any preauthorization of the services and items shall also be documented. The initial copy of the supporting medical notes or records shall be produced without separate or additional charge to the employer, insurance carrier or employee. Payment for hospital services, including payment for invoices rendered for emergency department services, shall be made within 30 days of the submission of a “clean claim” accompanied by notes documenting the employee’s condition and the appropriateness of the evaluation, treatment or therapy.
‡ ‡ ‡
(h) Prompt pay required for non-preau-thorized care. — An employer or insurance carrier shall be required to pay a health care invoice within 30 days of receipt of the invoice as long as the claim contains substantially all the required data elements necessary to adjudicate the invoice, unless the invoice is contested in good faith. If the contested invoice pertains to an acknowledged compensable claim and the denial is based upon compliance with the health care payment system and/or health care practice guidelines, it shall be referred to utilization review. Any such referral to utilization review shall be made within 15 days of denial. Unpaid invoices shall incur interest at a rate of 1% per month payable to the provider. A provider shall not hold an employee liable for costs related to nondisputed services for a compensable injury and shall not bill or attempt to recover from the employee the difference between the provider’s charge and the amount paid by the employer or insurance carrier on a compen-sable injury.
# ^ s}: sfs jfc
(j) Utilization review. — The Health Care Advisory Panel shall develop a utilization review program. The intent is to provide reference for employers, insurance carriers, and health care providers for evaluation of health care and charges. The intended purpose of utilization review services shall be the prompt resolution of issues related to treatment and/or compliance with the health care payment system or practice guidelines for those claims which have been acknowledged to be compensable. An employer or insurance carrier may engage in utilization review to evaluate the quality, reasonableness and/or necessity of proposed or provided health care services for acknowledged compen-sable claims. Any person conducting a utilization review program for workers’ compensation shall be required to contract with the Office of Workers’ Compensation once every 2 years and certify *321 compliance with Workers’ Compensation Utilization Management Standards or Health Utilization Management Standards of Utilization Review Accreditation Council (“URAC”) sufficient to achieve URAC accreditation or submit evidence of accreditation by URAC. If a party disagrees with the findings following utilization review, a petition may be filed with the Industrial Accident Board for de novo review. Complete rules and regulations relating to utilization review shall be approved and recommended by the Health Care Advisory Panel. Thereafter, such rules shall be adopted by regulation of the Department of Labor pursuant to Chapter 101 of Title 29. Such regulations shall be adopted and effective not later than 1 year after the first meeting of the Health Care Advisory Panel.[19]
Remaining portions of § 2322F relate to coordination of benefit payments from health insurance carriers and worker’s compensation carriers. By regulation, the Department of Labor set up the precise process for utilization review. Again these regulations are pertinent to the issue at hand and in relevant part provide:
5.1 Pursuant to chapter 101, title 29 of the Delaware Code, the Department of Labor has developed a utilization review program with the intent of providing reference for employers, insurance carriers, and health care providers for evaluation of health care and charges. The intended purpose of utilization review services is to provide prompt resolution of issues related to treatment and/or compliance with the health care payment system or practice guidelines for those claims which have been acknowledged to be compensable, without the employer or its insurance carrier obtaining legal representation, or incurring the costs associated with legal involvement in the utilization review process.
5.2 An employer or insurance carrier may engage in utilization review to evaluate the quality, reasonableness and/or necessity of proposed or provided health care services for acknowledged compen-sable claims. Any person conducting a utilization review program for workers’ compensation shall be required to contract with the Office of Workers’ Compensation once every two (2) years and certify compliance with Workers’ Compensation Utilization Management Standards or Health Utilization Management Standards of Utilization Review Accreditation Council (“URAC”) sufficient to achieve URAC accreditation or submit evidence of accreditation by URAC.
‡ jjj
5.4.1 The utilization review company shall be randomly selected by the Department of Labor. The utilization review company first assigned to the case will remain with that case throughout its duration. The Department of Labor will collect all documentation required to be submitted pursuant to the utilization review process and send such documentation for review to the utilization review company.
5*C í¡í
5.5.1 The decision of the utilization review company shall be forwarded by the Department of Labor, by Certified Mail, Return Receipt Requested, to the claimant, the health care provider in question, and the employer or its insurance carrier. A decision of the utilization review company shall be final and conclusive between the parties unless within 45 days from the date of receipt of the utilization review decision any interested *322 party files a petition with the Industrial Accident Board for de novo review.[20]
The Court has intentionally gone to great length to set out the statutory scheme created in the 2007 legislation and pertinent regulations promulgated under that scheme. For purposes of this opinion, however, that scheme can be boiled down to this: when the employer/carrier acknowledges that a work-related injury has occurred, or was aggravated, etc., it submits bills for medical expenses to the Department of Labor for utilization review by a company or person selected by the Department. Clearly such a person or organization is private and not a public employee.
The decision of this reviewer is final unless the employee, employer or carrier appeals to the Board.[21]
The issue comes down, in effect, to one word, “acknowledged.” It is used twice in § 2322F(j), the section setting up the utilization review program. It is not a loosely used term, nor is it ambiguous. It is not, however, defined in the statute. In such eases, a word is construed according to its common and approved usage.[22] Acknowledge has been defined as “accept or admit the existence or truth of,” and to “accept the validity or legitimacy of.”[23]
Case law echoes this definition. In State v. Wolfe,[24] the Court was considering the word “acknowledged” in the context of paternity. The need to acknowledge was a statutory pre-requisite for imposing support obligations. The court held the father had signed an acknowledgment of paternity (the issue was whether what he signed needed to be verified — notorized— which the Court held it need not). The court noted the use of “the word ‘acknowledge’ can only be taken in its usual and common meaning which is ‘(t)o own, avow or admit; to confess; to recognize one’s acts, and assume the responsibility therefore.’ ”[25]
The State of Delaware did not admit, avow, recognize, accept or agree that Poole had injured himself at work, and it disputed causation of his injuries. Plain and simple, this is not acknowledging his injury. This, of course, compelled Poole to exercise the right he has to petition the Board to determine he had a work related injury, that his injuries were causally related, and have it determine what medical expenses should be awarded.
The State concedes that it disputed work-relatedness and causation and knew that if it opted to seek utilization review it was waiving its right to contest Poole’s claims. The State’s position in this regard undercuts its argument: it cannot contest injury and yet seek utilization review of an injury it did not acknowledge. But when it does not acknowledge there was a compensable injury, is it still entitled to utilization review? The statutory scheme enacted in 2007, and its context with the remainder of the Worker’s Compensation laws clearly indicate not.
That 2007 enactment did not amend 19 Del. C. § 2322 but added §§ 2322A-F. Of *323 particular note is that § 2322(a) was not amended or deleted and still provides:
(a) During the period of disability the employer shall furnish reasonable surgical, medical, dental, optometric, chiropractic and hospital services, medicine and supplies, including repairing damage to or replacing false dentures, false eyes or eye glasses and providing hearing aids, as and when needed, unless the employee refuses to allow them to be furnished by the employer.[26]
The legislative purpose behind this provision is “(1) to insure the employer against unreasonable charges and against fraudulent claims, and (2) to insure at all times adequate medical assistance to the employee.”[27] “What constitutes reasonable medical services under § 2322(a) is not defined by statute and, therefore, is left to be determined by the Board on a case-by-case basis.”[28] “Whether medical services are necessary and reasonable or whether the expenses are incurred to treat a condition causally related to an industrial accident are purely factual issue[s] within the purview of the Board.”[29] It is well settled in Delaware that the Board is within its authority to accept the testimony of one medical expert over that of another.[30]
The 2007 enactment must be read in context of those pre-existing provisions in the Workers’ Compensation laws which were not repealed or amended. The 2007 enactment did not remove the power of the Board to not make these decisions. Particularly the word “reasonable” was not deleted from § 2322(a) nor was the Board divested of the authority to determine what is or is not reasonable and necessary. Further, the Board was not authorized to bifurcate the decision on compensability and causation from what is fair and reasonable. Especially notable, the Board was not empowered to delegate the decision of reasonable and necessary to any kind of third-party in controverted cases brought before it.
It is quite evident the scheme for handling uncontroverted compensation cases, those where the relationship, causation of injury, aggravation, etc., are not in issue are to be handled in a more direct way than the heretofore “system” for such cases. The legislative intent is obvious: (1) to streamline the method of and payment of expenses in cases where the employer does not dispute, i.e., “acknowledges,” injury; (2) to speed up the process for reviewing reimbursement of expenses sought; (3) to establish cost control and savings for employers and insurers; and (4) to bring more uniformity to the costs which will be allowed, which also creates more certainty for all involved.
On the other hand, the legislature just as clearly did not intend to prolong the process or make it more expensive where employees and employers dispute injury and/or causation. To accept what the Board did here and to accept the State’s argument would do just that and run contrary to the intent of the 2007 enactment and established statutes, procedures, policies and precedent for and in contested workers’ compensation cases.
The Board’s approach here could easily mean that there would now be a three-step process in disputed cases. First, the *324 Board would determine if there were a work-related injury (or re-injury or aggravation, etc.). Second, the Board would refer issues of medical expenses to utilization review. Third, if the employee, employer or carrier were dissatisfied with the result of that review, the matter would go back before the Board for a de novo review. In short, there is a distinct possibility there could be two Board hearings with more witnesses and more expense, and if an award were made to the injured employee more time would elapse before he or she has the medical expenses paid.
It is inconceivable the General Assembly intended anything as cumbersome, time consuming, and fraught with potential extra expense as that in contested cases. It is an absurd result which courts are duty bound to avoid when interpreting a statute. By engrafting the process for payment of “acknowledged” compensable cases onto disputed eases, the Board erred. It had no authority to permit the Employer to submit the medical bills for utilization review. When it redacted “reasonable and necessary” from its original decision, it abdicated its statutory and case law responsibility to make that decision. The 2007 enactment gave it no such authority though the Board, incorrectly, in some other case, has done what it did in Poole’s case.[31] On plenary review, this Court does not find those decisions as creating precedent the Court must follow. As the footnoted decisions show, there is a lack of uniformity by the Board in dealing with the issue to seek or not to seek utilization review. These contrary results do not, in the Court’s view, demonstrate an ambiguity in the statute triggering other statutory interpretation maxims.
Despite the conflict in the Board’s decisions of referring or not referring medical expenses for utilization review, two Board decisions show the direction the Board should, if not must take, in this and future cases. One such case is McKnight v. Fedex Freight East, Inc.[32] One of the disputes was the role of a non-work injury and its causal relationship to a work injury. The Board found there was an aggravation of the work injury. The employer’s doctor said the treatment, however, was reasonable and necessary. The Board recognized the system now in place for payment guidelines, also known as the Delaware Practice Guidelines (“DPG”).[33] The Board did not invoke utilization review but based its award of medical expenses within those guidelines.
This approach appropriately melds the purposes of the Workers’ Compensation laws existing prior to the 2007 enactment and the provisions in that enactment to regularize, streamline and control costs. Arguably, the Board may not have authority to use the DPG to fulfill its statutory *325 duty to determine what is reasonable and necessary in disputed cases. Yet if it did not employ the DPGs in making that determination there is potential for a two tier system of allowable medical expenses, those allowed for “acknowledged” cases using the DPGs and those the Board, in a vacuum, awards in contested compensation cases without reference to DPGs. This, too, would be an absurd result and one patently not consistent with legislative intent for the 2007 enactment. It is not, therefore, inappropriate, for the Board, in contested cases, to use the DPGs as a means of determining necessary and proper treatment and the amount to be awarded.
After all, the 2007 enactment explicitly gives the Board jurisdiction to hear de novo appeals from utilization review decisions where those DPGs have been used. On such a review, therefore, it has to familiarize itself with them. Further, some of the Board decisions cited above have already involved the Board’s use of DPGs.
The Court finds in this case that the Board erred in removing the phrase “reasonable and necessary” from its original decision and in referring Poole’s claim for medical expenses, and apparently also for a determination of reasonable and necessary, to utilization review. This matter is to be reconsidered by the Board only incorporating its original finding of reasonable and necessary into an award of medical expenses but, nevertheless, consistent with the DPGs. If there has been such a review, it is to be ignored as there was no authority to seek it.[34]
This Court is aware that the Department of Labor’s website provides instruction to interested parties how to proceed in disputed cases in a way consistent with the course the Board took here. That needs to be changed, at a minimum, to indicate the current instructions are wrong or to change them altogether to conform to this opinion. Even if there is an appeal (which a remand prevents for a while) of this decision, interested members of the public should not be mislead into believing the correctness of the current instruction procedures pending the appeal.

Conclusion

For the reasons stated herein, the decision of the Industrial Accident Board is REVERSED and REMANDED for action in conformity with this opinion.
IT IS SO ORDERED.

. Poole v. State of Del., No. 1351679, at 3-6 (Del.I.A.B. Feb. 3, 2011).

. Id. at 14-17.

. Stoltz Mgmt. Co., Inc. v. Consumer Affairs Bd., 616 A.2d 1205, 1208 (Del.1992).

. Ingram v. Thorpe, 747 A.2d 545, 547 (Del.2000); State v. Cephas, 637 A.2d 20, 23 (Del.1994).

. Ingram, 747 A.2d at 547.

. Dir. of Revenue v. CNA Holdings, Inc., 818 A.2d 953, 957 (Del.2003).

. Id. (quoting Newtowne Village Serv. Corp. v. Newtowne Rd. Dev. Co., Inc., 772 A.2d 172, 175 (Del.2001)).

. Hirneisen v. Champlain Cable Corp., 892 A.2d 1056, 1059 (Del.2006).

. Id.

. Ingram v. Thorpe, 747 A.2d 545, 547 (Del.2000).

. 19 Del. C. § 2322A(a).

. 19 Del. C. § 2322B(l)-(2).

. 19 Del. C. § 2322B(4).

. 19 Del. C. § 2322B(6).

.19 Del. C. § 2322B(7).

. 19 Del. C. § 2322B(8).

. 19 Del. C. § 2322B(14).

. 19 Del. C. § 2322C.

. 19 Del. C. § 2322F(a)-(b), (h), (j). (emphasis added).

. 19 Del. Admin. C. § 1341-5.0. (emphasis added).

. 19 Del. C. § 2322F(j).

. Coastal Barge Corp. v. Coastal Zone Ind. Control Bd., 492 A.2d 1242, 1246 (Del.1985).

. OXFORD AMERICAN DICTIONARY (3d ed. 2010).

. 156 Conn. 199, 239 A.2d 509 (1968).

. State v. Wolfe, 239 A.2d at 512-513 (citing Black's Law Dictionary and Webster's Dictionary. Accord Weyerhaeuser Timber Co. v. Marshall, 102 F.2d 78 (9th Cir.1939)).

. 19 Del. C. § 2322(a). (emphasis added).

. McCormick Transp. Co. v. Barone, 89 A.2d 160, 163 (Del.Super.1952).

. Willey v. State, 1985 WL 189319, at *2 (Del.Super. Nov. 26, 1985).

. Bullock v. K-Mart Corp., 1995 WL 339025, at *3 (Del.Super. May 5, 1995).

. DiSabatino Bros., Inc. v. Wortman, 453 A.2d 102, 106 (Del.1982).

.A number of Board decisions were cited to the Court, some of which showed the Board had in prior cases done what the Board here did, found an injury occurred but sought utilization review of the medical expenses sought. But these prior Board decisions are not consistent. Examples of cases where the Board found a compensable accident but sought utilization review are Maike v. Two Farms, Inc., No. 1344346, at 18-19 (Del. I.A.B. Aug. 5, 2011) and Casteneda v. The Back Burner, No. 1377789, at 11 (Del. I.A.B. June 25, 2012).
Examples of where the Board found com-pensability in disputed cases but did not invoke utilization review and awarded reasonable and necessary medical expenses are: Perez v. Chase Manhattan Corp., No. 1351395, at 9-10 (Del.I.A.B. Jan. 7, 2011); Valazquez v. Qdoba Mexican Grill, No. 1368002, at 13-14 (Del.I.A.B. Nov. 8, 2011); Rivera v. Markatos Cleaning Srvs., No. 1363379, at 11 (Del.I.A.B. July 20, 2011).

. No. 1366818 (Del.I.A.B. Nov. 18, 2011).

. 19 Del. C. § 2322B.

. In twenty-twenty hindsight, this Court wishes it had granted the State’s motion to stay. A stay, however, really went to the heart of the issue and there was no meaningful briefing at the point that motion was filed.