# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GILES & RANSOME, )
                                     )
    Appellant/Employer-Below, )
                                       )
    v. )           C.A. No. N17A-10-001 CEB
                                         )
PATRICK KALIX, )
                                       )
    Appellee/Employee-Below. )

Submitted: June 22, 2018
Decided: October 9, 2018

## MEMORANDUM OPINION

*Upon Consideration of Industrial Accident Board Appeal.*
**AFFIRMED.**

H. Garrett Baker, Esquire, Elzufon Austin & Mondell, P.A., Wilmington, Delaware. Attorney for Employer-Below Appellant.

Donald E. Marston, Esquire, and James R. Donovan, Esquire, Doroshow Pasquale Krawitz & Bhaya, Bear, Delaware. Attorneys for Employee-Below Appellee.

**BUTLER, J.**

## INTRODUCTION

Before the Court is an appeal of an Opinion and Order issued by the Industrial Accident Board in the above matter. While the issues on appeal are fairly straightforward by litigation standards, the case illustrates some cutting edge issues likely to arise when the law must accommodate the emergence of medical marijuana. A brief history is in order.

## FACTS AND PROCEDURAL HISTORY

Mr. Kalix was a diesel mechanic, employed by Giles & Ransome in 2005 when he injured his back in a workplace accident.[1] The back injury resulted in three separate surgeries over the next few years, all performed by Dr. Bose.[2] Mr. Kalix continued to experience severe back pain, treated with various and sundry pain relievers.[3]

During this same period, Kalix was consuming marijuana in its "prelegal" form, purchased from illegitimate sources, of unknown quality and smoked as a pastime.[4]

---

[1] Op. below at 2.

[2] Op. below at 16.

[3] Id.

[4] R. at 6.

1

Eventually, Kalix became interested in medical marijuana. He asked his doctor to authorize him to purchase it through Delaware's first medical marijuana dispensary.[5] By this time, his primary means of pain relief was OxyContin and other narcotics.[6]

Because of his medical problems, Kalix knew a number of physicians.[7] Neurologist Dr. Bruce Grossinger is the one that signed Kalix's application for a medical marijuana card in April, 2016.[8] From the testimony, we learned that the application for a medical marijuana card is then sent to the Delaware Division of Public Health, which processes and issues the cards.[9]

But once the medical marijuana card is obtained, the process becomes quite different from other medicines typically administered by prescription.[10] The card entitles the holder to go to the medical marijuana dispensary and choose his/her own method of marijuana ingestion and dosage, up to 168 grams (six ounces) per month, with no other limitation.[11] While the physician promises to monitor usage in the

---

[5] Op. below at 2.

[6] R. at 5.

[7] Op. below at 2—10; R. at 5—7.

[8] Op. below at 2.

[9] Id.

[10] Op. below 3—4.

[11] Op. below at 4.

2

application process, the physician does not control dosage or frequency as she/he would in a typical pharmaceutical setting.[12] The patient and the clinic decide how much of what strain of marijuana and in what form the patient should take it and how often.[13] In this case, this flexibility caused the employer a number of concerns raised below.[14]

Perhaps equally concerning to the employer was the process by which Kalix got the card. Dr. Grossinger signed off on the medical marijuana card application even though he had not seen Kalix for close to 2 years.[15] For reasons not clear in the record, a different doctor in Grossinger's office, Dr. Silberman, performed a substance abuse "risk assessment" several months *after* Kalix had received his marijuana card.[16] Dr. Silberman found Kalix to be at "high risk" for abuse of the marijuana. But shortly after speaking to Dr. Grossinger, Dr. Silberman amended his finding from "high risk" to "no risk" for abuse.[17] This was, perhaps understandably, a source of contention in the hearing before the Board. But whether at high risk for

---

[12] Op. below at 3—4.

[13] Op. below at 3.

[14] R. at 6—7.

[15] R. at 6.

[16] Op. below at 5—8.

[17] Op. below at 13.

abuse or no risk, it appears that a medical marijuana card is available even to historical substance abusers, or at least that historical abuse is not an absolute bar.

In addition to the deposition testimony of Drs. Grossinger and Silberman, the Board heard live testimony from Dr. Townsend, a board certified neurologist, who testified on behalf of the employer.[18] Having read the transcript, the Court agrees with the Board that put it pretty succinctly: "Dr. Townsend essentially agreed that medical marijuana was a reasonable treatment modality."[19]

Once Kalix got his authorization to shop for marijuana at the dispensary, he began experimenting with different THC and CBD contents. He testified that this was all with a view to figuring out what dosage/active ingredients gave him the most pain relief.[20] The employer took the position at the hearing that Kalix was abusing the prescription, making many visits to the dispensary and consuming prodigious amounts of marijuana in the first 6 months of his authorization.[21] Kalix ran up over $21,000 in medical marijuana costs in the year from May, 2016 to the hearing in

---

[18] Op. below at 15—20.

[19] Op. below at 25.

[20] R. at 126—130.

[21] Op. below at 2.

4

May, 2017. [22] While his monthly consumption never exceeded the 168 gram per month maximum, it was still quite high in the first six months of the prescription.[23]

Kalix testified that once he got his content and dosage figured out, he was able to moderate his consumption and, by the time of the hearing, he was consistently consuming about 50 grams per month.[24] Dr. Townsend agreed that 50 grams per month sounded reasonable to him, a conclusion the Board adopted as well.[25]

The employer maintains that Kalix's high dosage of marijuana consumption in the early months of his legal access to marijuana was not dosage, mode and quality experimentation, but rather drug abuse, pure and simple. As the Court understands its argument, the employer is not so much upset with Kalix's consumption in excess of 50 grams as he experimented, but rather that his consumption was so extreme that it cannot possibly be attributed to experimentation. This is why, for the employer, the discredited doctor's testimony about his risk for substance abuse is important: Kalix is a habitual, long term marijuana smoker who was given the keys to the dispensary, took advantage of it, and now wants the employer to foot the bill for his drug abuse.

---

[22] R. at 132.

[23] Op. below at 17 and 19.

[24] Op. below at 20.

[25] Id.

At the Board, the employer complained that it should not be saddled with the bill for Kalix's drug abuse—or dosage and quality experimentation—depending on one's characterization, when his monthly purchases were close to 160 grams per month. After all, the expert and the Board found that about 50 grams was all that was "reasonable and necessary."[26] The Board recognized that establishing the reasonableness of the costs "is in fact a more problematic exercise because medical marijuana is not within the Healthcare Practice Guidelines nor is it part of the fee schedule, see 19 Del. C. §2322B."[27] In "normal" prescription drug circumstances, the Administrative Code provides specific caps on payment according to the "Average Wholesale Price" of the drug, but no such schedule exists for a prescription for marijuana.[28] So in the absence of "legislative guidance," the Board elected to order the employer to reimburse the claimant for the full expense of his experimentation in dosage and frequency, even that in excess of the 50 grams per month Dr. Townsend had found "reasonable."[29]

---

[26] Def.'s Mot. For Reargument at 2.

[27] Op. below at 25.

[28] Op. below at 26.

[29] Id.

## STANDARD OF REVIEW

When reviewing a Board decision, we review for errors of law and substantial evidence to support the Board's factual and legal findings. "Absent error of law, the standard of review for Industrial Accident Board's workers' compensation decision is abuse of discretion."[30] Moreover, "The appellate court 'does not sit as a trier of fact with authority to weigh the evidence, determine questions of credibility, and make its own factual findings and conclusions.' Those functions are vested in the IAB."[31]

## DISCUSSION

It seems to the Court that there are two ways the Board could have gone here: limit the claimant to reimbursement of 50 grams per month that Dr. Townsend testified to be a reasonable, normal dose, or allow reimbursement for the claimant's "experimental period" that was a good deal in excess of 50 grams per month. How the Board reached its decision says much about how the Board viewed the conflicting arguments whether Kalix's heightened consumption period was a function of drug abuse or legitimate experimentation. The Board opted for the latter.[32] This was a legitimate choice among the available explanations for Kalix's

---

[30] Person-Gaines v. Pepco Holdings, Inc., 981 A.2d 1159 (Del. 2009).

[31] *Glanden v. Land Prep, Inc.,* 918 A.2d 1098, 1100—01 (Del. Supr. 2007) (quoting *Johsnon v. Chrysler Corp.,* 213 A.2d 64, 66 (Del. 1965)).

[32] Op. below at 28.

large consumption. The employer's continued attack on those findings does not negate the deference the reviewing court gives to the Board, particularly in matters involving witness credibility.

The issue on appeal is not whether the Board chose correctly, but rather whether its finding is supported by substantial evidence. Where the evidence is conflicting, it is not for this Court to reweigh the credibility of witnesses or make its own factual findings[33] The narrow question is whether the Board's conclusions were supported by substantial evidence. The determination of medical expenses as "reasonable and necessary," so as to be covered by the employer, is in the Board's discretion.[34] The fact that the Board might have concluded otherwise, or there was other evidence in opposition to the evidence credited by the Board does not negate the limited nature of appellate review of Board decisions.[35]

Likewise, the employer's demand to limit the reimbursement to the 50 grams per month Kalix ultimately found relief with is an unrealistic restriction on the nature

---

[33] *Playtex Prods. V. Harris,* 2002 Del. Super. LEXIS 236 (Del. Super. Ct. Sept. 30, 2002), *aff'd,* 818 A.2d 970 (Del. 2003) ("Disputes over the reasonableness of medical expenses were factual questions for the Delaware Industrial Accident Board to decide").

[34] *Poole v. State,* 77 A.3d 310 (2012) ("Whether medical services are necessary and reasonable or whether the expenses are incurred to treat a condition causally related to an industrial accident are purely factual issues within the purview of the Industrial Accident Board").

[35] *Glanden v. Land Prep, Inc.,* 918 A.2d 1098, 1100-01 (Del. Supr. 2007); *Munyan v. Daimler Chrysler Corp.,* 909 A.2d 133, 136 (Del. Supr. 2006).

of marijuana as medicine and the normal medical practice of experimenting with pain relief. The employer contends there is no space for the patient to experiment with dosages and medications. But doing so is completely reasonable and necessary in the field of medicine generally when prescribed by a doctor.[36] The employer would place a restriction on medical marijuana that would not even be considered if the drug were, for example, oxycodone. The employer's argument would vitiate reimbursement for any rehabilitative effort that was subsequently changed in favor of a different treatment.

It may well be that as the science of medical marijuana develops, there will develop a more precise dosage and modality for specific symptoms that would permit a more limited range of prescribed dosages. But given the novelty of medical marijuana and the statutorily authorized dosage parameters set by the General Assembly, the Court cannot conclude that the Board abused its discretion in requiring the employer to reimburse the claimant for his experimentation phase of this new treatment.

The employer's other complaint is more straightforward. The testimony at the hearing included that of the claimant himself, who described a trip to the marijuana dispensary.[37] It appears that there is a fairly ritualized process necessary

---

[36] Op. below at 23.

[37] R. at 125—133.

9

to get into that portion of the dispensary that actually contains medical marijuana in all of its many available forms.[38] As Mr. Kalix described it, once the patient makes his selection, it is packaged and brought to the checkout counter at which point he pays for it.[39] He testified that he paid for all of it, with his money, and none of it was reimbursed by the insurance company.[40] A detailed "customer history" of all of his purchases at the dispensary, including the date, time, product, discounts, and total was included for the Board's consideration.[41]

None of this was controversial at the time the testimony was received. But after the hearing, the employer claimed that the customer history log was insufficient evidence to show that Kalix had actually paid the amounts shown in the ledger.[42] And since the employer's obligation to reimburse does not arise until the expense is incurred, the employer argued in post hearing briefing that Kalix had not shown an actual expense.[43]

---

[38] R. at 125.

[39] R. at 127.

[40] R. at 132—33.

[41] Pl.'s "Claimant's Exhibit 2 - Customer History".

[42] Def.'s Mot. for Reargument at 3—4.

[43] 19 Del.C. § 2322; *Guy J. Johnson Transp. Co. v. Dunkle*, 1988, 541 A.2d 551.

The employer contends that a debtor's *ipse dixit* that a payment has been made improperly relieves the debtor of any burden to prove it.[44] The simple answer is that this is not a debt action and Kalix is not seeking to avoid payment by arguing satisfaction of the debt. Second, the employer says that there was no support in the record that the dispensary operates on a "cash and carry" basis other than the claimant's say-so.[45] But neither was there any evidence that it does *not* operate on a cash and carry basis, as testified to by the claimant. The Board was empowered to credit the claimant's testimony, and it did so.[46] Finally, the employer complains that the customer history was only a history of what was billed, not a history of what was paid.[47] But Kalix testified that he paid the bills as he purchased the marijuana on each of his trips to the dispensary.[48] Certainly copies of bank statements or credit card payments might have further proven the actual making of the payments evidenced by the customer history, but Kalix's own testimony, coupled with the

---

[44] Def.'s Mot. for Reargument 3—4.

[45] Id.

[46] Board's Order at 2 (9/6/2017).

[47] Def.'s Mot. for Reargument at 3—4.

[48] R. at 132—33.

customer history were also sufficient evidence before the Board such that it could make the findings of payment without further elaboration.[49]

Neither at the proceeding below nor here does the employer suggest who did pay the dispensary, and the Board pointed to 16 Del. C. §4919A, containing detailed record-keeping requirements to further demonstrate the likelihood that Kalix had, as he testified, paid the amounts shown in the customer history.[50] Thus, the Board chose to give credence to the testimony of Kalix that he paid the amounts shown, a completely logical conclusion in the face of no contradictory evidence from the employer.[51] Pointedly, the employer did not attack the accuracy or veracity of the customer history when it was introduced. Thus, there was no basis for the Board to question its validity. The employer's arguments *post hoc* are a poor substitute for evidence or testimony that Kalix did not, as he testified, pay the amounts recorded.

## CONCLUSION

For all of the foregoing reasons, the judgment of the Industrial Accident Board is **AFFIRMED**.

**IT IS SO ORDERED.**

_____
Charles E. Butler, Judge

---

[49] Op. below at 25—26.

[50] Board's Order at 2 (9/6/2017).

[51] Id.