IN THE SUPREME COURT OF THE STATE OF DELAWARE

ZELDA SHEPPARD,                           §
                                          §   No. 346, 2021
    Appellant Below, Appellant            §
                                          §   Court Below:  Superior Court
    v.                                    §   of the State of Delaware
                                          §
ALLEN FAMILY FOODS,                       §   C.A. No. S20A-07-001
                                          §
    Appellee Below, Appellee.             §


                        Submitted:   April 27, 2022
                        Decided:     June 23, 2022


Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.


Upon appeal from the Superior Court.  **AFFIRMED**.


Walt F. Schmittinger, Esquire, Gary E. Junge, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware *for Appellant*.


John W. Morgan, Esquire, Heckler & Frabizzio, Wilmington, Delaware *for Appellee*.


**VALIHURA**, Justice:

This is an appeal of a September 29, 2021 decision by the Superior Court affirming a decision by the Industrial Accident Board ("IAB" or "Board") granting Allen Family Foods' ("Employer") Petition for Review ("Petition"). The IAB determined that Zelda Sheppard's ("Sheppard") prescribed narcotic pain medications were no longer compensable. Sheppard sought to dismiss the Petition at the conclusion of Employer's case-in-chief during the IAB hearing, arguing that the matter should have been considered under the utilization review process. After hearing the case on the merits, the IAB disagreed, holding that Employer no longer needed to compensate Sheppard for her medical expenses after a two-month weaning period from the narcotic pain medications. The Superior Court affirmed.[1]

Sheppard raises one issue on appeal. She argues that the IAB erred as a matter of law when it denied Sheppard's Motion to Dismiss Employer's Petition because Employer failed to articulate a good faith change in condition or circumstance relating to the causal relationship of Sheppard's treatment to the work injury. Accordingly, Sheppard argues that the Employer was required to proceed with the utilization review process before seeking termination of her benefits.

For the reasons set forth below, we **AFFIRM** the decision of the Superior Court.

---

[1] Opening Br. Ex. B (*Sheppard v. Allen Fam. Foods*, No. 1373143 (Del. I.A.B. May 11, 2022)) [hereinafter IAB Decision].

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND[2]

### A. Sheppard's Initial Injury

On April 4, 2011, Sheppard slipped and fell on Employer's cafeteria floor, injuring her neck, low back, left arm, and left leg (the "Accident").[3] According to Sheppard, she has sought medical treatment with various providers since the Accident for continuing problems with her neck, back, left arm, and left leg.[4] Following the Accident, Sheppard received total disability benefits.[5]

Sheppard was prescribed both opiate and non-opiate medications following the Accident. She stated that these medications helped with her symptoms, but because they were not long-acting, she "still need[ed] medication for break-through pain."[6]

---

[2] A few references are made to two other IAB decisions involving Sheppard's Accident, including Sheppard's Petition to Determine Additional Compensation Due and Employer's 2016 Utilization Review. *See Sheppard v. Allen Fam. Foods*, No. 1373143 (Del. I.A.B. June 30, 2014) [hereinafter *Sheppard Decision 2014*]; *Sheppard v. Allen Fam. Foods*, No. 1373143 (Del. I.A.B. Aug. 1, 2017) [hereinafter *Sheppard UR Appeal 2017*]. Both decisions are included in Sheppard's Amended Compendium of Unreported Cases to Appellant's Amended Opening Brief on Appeal.

[3] I.A.B. Decision at 12. The IAB noted the following complaints Sheppard had after her injury: "complaints of diffuse pain in [her] neck, low back, left shoulder, both hips, and left leg." *Id.* at 3.

[4] Sheppard initially sought medical treatment at Beebe Health Care with Dr. Green; however, Sheppard's doctor has changed a few times since then. After Dr. Green, Sheppard treated with Dr. Eva Dickinson, and then with Dr. Gala at Alpha Care Medical in 2017. At some point, Sheppard stopped treating with a doctor and instead was treated by a nurse practitioner, Ms. Patricia M. Grady. *Id.* at 12. The full names of some of Sheppard's treating doctors are not provided in the record.

[5] A009 (I.A.B. Hr'g Tr. at 4).

[6] I.A.B. Decision at 12.

3

*B.*    *Sheppard's Petition to Determine Additional Compensation Due*

On August 31, 2012, Sheppard filed a Petition to Determine Additional Compensation Due alleging that she had suffered permanent impairment as a result of her work related injuries.[7]   Specifically, Sheppard sought "10% impairment to the cervical spine, 10% impairment to the lumbar spine and 7% impairment to the right upper extremity."[8]   On July 2, 2014, the IAB ruled that Sheppard had proved that her injuries resulted in a permanent impairment and that Employer was required to pay benefits for "10% impairment to the cervical spine and 7% impairment to the right upper extremity[.]"[9]

*C.*    *Employer's 2016 Utilization Review and Sheppard's Appeal*

In 2016, Employer requested review of "the 8/29/19 and ongoing health care treatment/service for medications prescribed by Dr. Eva Dickinson" ("Dr. Dickinson").[10] In order to challenge the treatment/service rendered by Dr. Dickinson, Employer pursued

---

[7] *Sheppard Decision 2014*, No. 1373143, at 2.

[8] *Id.*

[9] *Id.* at 20.  The IAB found, however, that Sheppard had not satisfied her burden to prove by substantial evidence that she had a permanent impairment to the lumbar spine.  *Id*. at 18.

[10] A088 (Notice of Non-Certification for Utilization Review at 2).  The Employer's initial request for Utilization Review in connection with Dr. Dickinson is not in the record before this Court.  It also appears that the reference to the 8/29/19 review is a typo, and should be 8/29/16, given that the date of the notice is September 19, 2016.

utilization review pursuant to 19 *Del. C.* § 2322F(j)[11] and Administrative Regulation 5.0.[12]

The details of Employer's request are not in the record; however, the utilization reviewer's

decision is.[13] After two unsuccessful attempts at contacting Dr. Dickinson, the utilization

reviewer determined that certain opioid medications prescribed to Sheppard by Dr.

Dickinson were not compliant with the Delaware Guidelines.[14]

---

[11] Section 2322F deals with billing and payment for health-care services, and subsection j deals with utilization review. In pertinent part, subsection j provides that:

> [t]he intended purpose of utilization review services shall be the prompt resolution of issues related to treatment and/or compliance with the health-care payment system or practice guidelines for those claims which have been acknowledged to be compensable. An employer or insurance carrier may engage in utilization review to evaluate the quality, reasonableness and/or necessity of proposed or provided health-care services for acknowledged compensable claims.

19 *Del. C.* § 2322F(j).

[12] Title 19, Section 1341-5.0, of the Delaware Administrative Code describes the Utilization Review. *See* 19 Del. Admin. C. § 1341-5.0 https://regulations.delaware.gov/AdminCode/title19/1000/1300/1340/1341.shtml (last visited Feb. 22, 2022).

[13] A087–88 (Notice of Non-Certification for Utilization).

[14] The reviewer certified that the treatment/services provided by Dr. Dickinson "d[id] not comply with the Delaware HCPS practice guidelines." A087 (Notice of Non-Certification for Utilization). Specifically, the reviewer stated that:

> Per the DE Guidelines, narcotic medications should be prescribed with strict time, quantity, duration and definitive cessation parameters. Pain is subjective in nature and should be evaluated using a scale to rate effectiveness of the narcotic prescribed.

> From the medical records received, there was no documentation of definitive cessation parameters. There was also no documentation of evaluation of pain by [Sheppard] based on a pain scale. More so, more than two opioid medications were prescribed. Apart from the designated short-acting opioid; oxycodone, and long-acting-opioid; hydromorphone, fentanyl and SUBSYS were also prescribed.

> There was no documentation of a second opinion for the use of more than two opioids from a specialist, as strongly recommended by the Delaware Guidelines.

Sheppard appealed the utilization reviewer's decision to the IAB requesting that the "Department of Labor emplead Dr. Dickinson in connection with the Utilization Review of her treatment in this case."[15] According to the IAB decision, the "Department issued the required notice to Dr. Dickinson of the scheduled hearing[;]" however, Dr. Dickinson did not appear for the hearing as scheduled.[16]

On August 1, 2017, the IAB affirmed the decision of the utilization reviewer and found that "Dr. Dickinson [] failed to substantiate the reasonableness and necessity of her treatment of [Sheppard] in relation to the [Accident]."[17] As a result of the utilization reviewer's decision, neither Employer, Employer's insurance carrier, nor Sheppard, would "have any liability or responsibility to Dr. Dickinson or her medical practice (nor any successor entity) for those medical expenses that were subject to the 9/19/2016 Utilization Review decision."[18] The IAB also stated that "any future treatment with any other provider may be subject to the Utilization Review process at the carrier's discretion and option, and in accordance with the Workers' Compensation Act and regulations.[19]

---

> With these, the use of Fentanyl DIS 25 mcg/hr and Subsys 1200 mcg, oxycodone 10 mg, and hydromorphone 32 mg 08/29/16 onward does not comply with the Delaware Guidelines.

A088 (Notice of Non-Certification for Utilization).

[15] *Sheppard UR Appeal 2017*, No. 1373143, at 1.

[16] *Id.*

[17] *Id.* at 1–2. The IAB noted that the utilization review decision dated September 29, 2016, was applicable to the treatment of Dr. Eva Dickinson only, and had no bearing on subsequent treatment obtained by Sheppard from other providers. *Id.* at 2.

[18] *Id.*

[19] *Id.*

*D.     Employer's 2019 Petition for Review*

On December 2, 2019, Employer filed the Petition pursuant to 19 *Del. C.* § 2347 seeking to terminate the compensability of Sheppard's narcotic medications and injection treatment.[20]     Employer argued that Sheppard's "narcotic pain medications are unreasonable, unnecessary, and unrelated to the industrial accident[.]"[21]   The parties stipulated to proceeding before the IAB hearing officer, and the hearing commenced on June 8, 2020.[22]

*1.     Employer's Case-in-Chief*

Employer presented one witness by deposition, namely, Jason Brokaw, M.D. ("Dr. Brokaw").[23]   Dr. Brokaw is a board-certified physical medicine, rehabilitation, and pain management doctor, and he is a certified provider under the Delaware Workers' Compensation system.[24]   Dr. Brokaw reviewed Sheppard's medical records and examined Sheppard on three separate occasions:  January 5, 2017, September 4, 2019, and February 27, 2020.[25]

---

[20] Although the Petition for Review mentioned terminating Sheppard's injection treatment, there was no testimony or argument presented regarding Sheppard's injections, and therefore the IAB did not address or rule on the injections.  *See* I.A.B. Decision at 13 n.2.

[21] *Id.* at 2.

[22] *Id.* at 2.  The hearing was held by a Workers' Compensation Hearing Officer in accordance with 19 *Del. C.* § 2301B(a)(4).

[23] The I.A.B. decision incorrectly identifies Jason Brokaw, M.D., as testifying on behalf of Sheppard.  *See* I.A.B. Decision at 3.

[24] B58–59 (Dr. Brokaw Dep. at 5–6).

[25] I.A.B. Decision at 3.

7

Regarding the visit that occurred on September 4, 2019, Sheppard stated that she was treating with Dr. Gala at Alpha Care Medical when he took over Dr. Dickinson's practice. Under Dr. Gala's care, Sheppard's medications included a Butrans patch, oxycodone, and cyclobenzaprine. Sheppard denied any history of illegal drug use, alcohol abuse, or other problems. Dr. Brokaw asked specifically about any marijuana use, but Sheppard denied using it. She also indicated that all her urine drug screens had been compliant. Contrary to Sheppard's answers to Dr. Brokaw's questions regarding marijuana use, "a vast majority of her urine drug screen tests were positive for marijuana from 2011 through 2019."[26]

Dr. Brokaw conducted a physical examination which revealed mild pain behavior. According to Dr. Brokaw, Sheppard had "self-limited range of motion of the cervical spine with complaints of pain, especially throughout the left neck and trapezius region" as well as "decreased range of motion of the left shoulder . . . weakness in the left shoulder[,] and she resisted attempts of passive range of motion, indicating nonphysiologic overlay."[27] He noted that Sheppard had a Butrans patch on her lumbar spine, and that the patch was not in the correct location.[28] According to Dr. Brokaw, a Butrans patch "is an opiate and has opioid risks[,]" and therefore the location of the patch is important because the medication is "absorbed and goes through the entire body[.]"[29] He testified that Butrans patch users

---

[26] *Id.*

[27] *Id.* at 3–4; *see* B64 (Dr. Brokaw Dep. at 11).

[28] I.A.B. Decision at 4.

[29] *Id.*; *see* B66 (Dr. Brokaw Dep. at 13).

are instructed to use the patch in certain locations, and finding the Butrans patch on Sheppard's lumbar spine indicated that she either "was not appropriately instructed in its use or was using it incorrectly."[30]

Based on Sheppard's physical examination and Dr. Brokaw's review of her record at the 2019 visit, Dr. Brokaw made the following assessments: there was a disproportionate description of pain relative to the nature of Sheppard's accident, Sheppard had ongoing high dose opiate medications,[31] and Sheppard was noncompliant "because she had not told the truth about her marijuana use to Dr. Brokaw or the treating providers."[32] Accordingly, Dr. Brokaw "recommended a complete detoxification from any abusable medications include opiates, benzodiazepines, Soma, and marijuana[.]"[33] In order to avoid abrupt withdrawal, he recommended reducing Sheppard's medications over the course of three-months, and then continuing treatment with "non-opioid medication management and occasional rounds of physical therapy."[34]

At the examination on February 27, 2020, Sheppard reported to Dr. Brokaw that she continued to receive her medications from Alpha Care Medical, but that she was no longer

---

[30] I.A.B. Decision at 4; *see* B66 (Dr. Brokaw Dep. at 13). According to Dr. Brokaw, "[t]he patient is instructed to use the Butrans patch around the shoulder girdle, the front of the shoulder, back of the shoulder, font of the chest, and back of the chest, by alternating the locations." I.A.B. Decision at 4.

[31] *See* B67 (Dr. Brokaw Dep. at 14). The opiate medications equated to a range of "ninety to one hundred milligrams of morphine equivalent [] per day with the combination of Butrans and oxycodone[.]" I.A.B. Decision at 4.

[32] I.A.B. Decision at 5.

[33] *Id.*; *see* B68 (Dr. Brokaw Dep. at 15).

[34] I.A.B. Decision at 5; *see* B69 (Dr. Brokaw Dep. at 16).

9

receiving treatment from Dr. Gala.  Instead, Sheppard reported that she was receiving treatment from the nurse practitioner.[35]  Sheppard's medications at this time included oxycodone, cyclobenzaprine, and ibuprofen.[36]  During this examination, Sheppard admitted to Dr. Brokaw that she used marijuana illegally (i.e., without a medical marijuana card), but that she was in the process of applying for a card.[37]  According to Dr. Brokaw, Sheppard told her treatment providers that she already had a prescription card for medical marijuana, but the providers never confirmed that assertion.[38]

Dr. Brokaw's 2020 examination of Sheppard was similar to the prior one, with Sheppard having limited range of motion and pain complaints, with the exception that at this visit Sheppard smelled of marijuana.[39]  Dr. Brokaw stated that although he believed medical marijuana to be useful in certain circumstances, in his opinion, it "would not be

---

[35] B70 (Dr. Brokaw Dep. at 17).  According to Dr. Brokaw, Sheppard told him that "there were no actual physicians at Alpha anymore[,]" and Dr. Brokaw stated Sheppard's statement was "corroborated by the card that she showed [him] with only nurse practitioners' names." *Id.*

[36] I.A.B. Decision at 5.  Sheppard reported that the Butrans patch had been stopped but "she was not really sure why." *Id.*; *see* B70–71 (Dr. Brokaw Dep. at 17–18).

[37] B70 (Dr. Brokaw Dep. at 17).

[38] *See* I.A.B. Decision at 5–6; B74 (Dr. Brokaw Dep. at 21).  According to Dr. Brokaw:

> Ms. Sheppard had told the providers at Alpha Care Medical that she had a medical marijuana certification card.  If you go through all of the treatment records from Alpha Medical Care, back in 2017 she told them that she was interested in it through them.  Although there is no documentation that they ever provided a medical marijuana certification.
>
> Overall it is clear that she was using marijuana for many years before this and that they had never certified her or for that matter made a copy or any other documentation showing that she actually had a medical marijuana certification.

B74–75 (Dr. Brokaw Dep. at 21–22).

[39] I.A.B. Decision at 5; B73 (Dr. Brokaw Dep. at 20).

10

appropriate for [Sheppard]."[40] He further testified that he "cannot causally relate a need for the ongoing treatment to [Sheppard's] industrial injury in April 2011, because her objective findings do not correlate to her subjective symptoms."[41] Dr. Brokaw testified as follows:

> Q. Okay. So she has muscular pain, she has neuropathic pain also; is that fair to say?
>
> A. I suppose so because of her description of her symptoms. You may also see in my previous reports that I cannot causally relate for a need for ongoing treatment to the work injury of April of 2011 because her objective findings do not correlate to her subjective symptoms.[42]
>
> . . . .
>
> I in general also wanted to provide some form of conservative care treatment that would benefit her so that we're not just cutting her off from all treatment. But, once again, Ms. Sheppard has an issue with not telling the truth and credibility.
>
> So I'm really not sure how much of the pain that she describes to me or her treating providers is genuine versus when you discuss musculoskeletal versus neuropathic. And I certainly don't correlate the need for ongoing treatment to the work injury of April 2011.[43]
>
> . . . .
>
> So, yes, I would correlate her need for any treatment to other problems, whether it's preexisting disease, subsequent disease or psychiatric disease.[44]

---

[40] B82 (Dr. Brokaw Dep. at 29); *see* I.A.B. Decision at 6–7.

[41] I.A.B. Decision at 7; *see* B88–89 (Dr. Brokaw Dep. at 35–36). According to Dr. Brokaw, Sheppard had "subjective symptoms that sound like neuropathic pain, such as the pain shooting up and down her left leg, but [Sheppard] has a credibility issue with not telling the truth, so Dr. Brokaw does not know how much of the pain she describes is genuine." I.A.B. Decision at 7.

[42] B87–88 (Dr. Brokaw Dep. at 34–35).

[43] B88–89 (Dr. Brokaw Dep. at 35–36).

[44] B89 (Dr. Brokaw Dep. at 36).

11

At the conclusion of Employer's case, Sheppard moved to dismiss or, in the alternative, for a directed verdict.[45] She argued that Employer sought to end Sheppard's ongoing medical treatment, and therefore, Employer had to submit Sheppard's treatment to the utilization review process.[46] Sheppard's motion was taken under advisement, and the hearing officer deferred her decision until after the case was heard on the merits.[47]

### 2. Sheppard's Case-in-Chief

Sheppard presented one witness by deposition, Patricia Grady, CRNP, ("NP Grady") the nurse practitioner who treated Sheppard.[48] NP Grady had 19 years of experience as a nurse practitioner and was licensed in Maryland and Delaware. In addition, NP Grady was a certified provider under the Delaware Workers' Compensation system.[49] NP Grady reviewed Sheppard's history of treatment with Alpha Care Medical.[50] She testified that Sheppard was stable and was benefiting from her treatment with narcotic

---

[45] I.A.B Decision at 2; A028 (I.A.B. Hr'g Tr. at 23).

[46] A028–30 (Hr'g Tr. at 23–25).

[47] Initially, the hearing officer denied the motion to proceed on with the merits of the case. A035 (I.A.B. Hr'g Tr. at 30). However, the hearing officer clarified that she was going to defer her decision. A036 (I.A.B. Hr'g Tr. at 31).

[48] A036 (I.A.B. Hr'g Tr. at 31).

[49] A037–38 (I.A.B. Hr'g Tr. at 32–33); B4–5 (NP Grady Dep. at 4–5). According to NP Grady, nurse practitioners initially train under a physician for approximately 500 hours; however, nurse practitioners can work independently and are "able to diagnose and treat illnesses." B5–6 (NP Grady Dep. at 5–6). In addition, NP Grady's credentials allow her to prescribe medications, both controlled substances (narcotics) as well as non-narcotic, non-controlled substances. B7 (NP Grady Dep. at 7). Employer challenged NP Grady's credentials, asking the IAB to determine whether NP Grady qualified as an expert medical witness. A039–40 (I.A.B. Hr'g Tr. at 34–45). However, the IAB found that "[g]iven Ms. Grady's credentials as a licensed nurse practitioner who is a certified provider pursuant to the Delaware workers' compensation system, [the IAB found] that she is capable of testifying as an expert medical witness[.]" I.A.B. Decision at 8 n.1.

[50] I.A.B. Decision at 8; B10 (NP Grady Dep. at 10); A042 (I.A.B. Hr'g Tr. at 37).

pain medication, and that she was a cooperative patient.[51] NP Grady disagreed with Dr. Brokaw's opinion that Sheppard was not compliant. NP Grady also did not agree that Sheppard should be discontinued from opiate medication.[52] Instead, NP Grady opined that the narcotic pain medication was reasonable, necessary, and was causally related to the Accident.[53]

On cross-examination, NP Grady indicated that her records showed Sheppard had a medical marijuana card, despite Sheppard's admission to Dr. Brokaw that she did not have one at that time.[54] NP Grady acknowledged that during Sheppard's treatment at Alpha Care Medical facility, there was no evidence of a decrease in the prescribed narcotic pain medication.[55] Rather, as NP Grady testified, Sheppard's narcotic medication had actually increased during March 2018.[56] In addition, NP Grady testified that Sheppard would be a "perfect patient" to be weaned off of opiate prescriptions and transitioned to use of the CBD or THC compounds.[57]

---

[51] I.A.B Decision at 9; B27 (NP Grady Dep. at 27).

[52] B26–27 (NP Grady Dep. at 26–27).

[53] I.A.B. Decision at 10–11; B28–29 (NP Grady Dep. at 28–29); B40 (NP Grady Dep. at 40).

[54] I.A.B. Decision at 9–11; B32–35 (NP Grady Dep. at 32–35); A049–51 (I.A.B. Hr'g Tr. at 44–46).

[55] I.A.B Decision at 12; B34–35 (NP Grady Dep. at 34–35).

[56] I.A.B. Decision at 12.

[57] B28 (NP Grady Dep. at 28). Specifically, NP Grady testified as follows:

> Q:  Okay. In terms of your expectations for the future, Ms. Grady, I assume given the consistency of what we've seen over the last few years, it would be fair to assume status quo essentially, that this may continue in the same fashion going forward for the foreseeable future?

Sheppard testified on her own behalf. She stated that she had been in continuous treatment since the Accident in 2011 and had suffered ongoing effects involving her "neck, back, left arm, and left leg."[58] She testified about her pain medications, occasions when she had to go without her medication, and how that affected her ability to do basic tasks around the house.[59] Regarding her medical marijuana card, Sheppard clarified that she obtained a medical marijuana card several weeks prior to the hearing, and that using marijuana (albeit illegally prior to receiving her card) had helped her.[60]

### E. The IAB Decision

On June 22, 2020, the IAB issued a written decision. The IAB briefly considered Sheppard's motion to dismiss and denied it, finding that utilization review was not

---

A: Yes. Of course, you know, our goal is -- our goal is definitely to lower, wean off of the opiates for sure, you know, for her to use more of the CBD, medical marijuana, mindfulness -- those are all things we stress -- cognitive behavioral health is also very helpful and CBD helps lower opiate reliance -- it really does. We've seen that -- I've seen that firsthand.

Q: Okay. So it sounds as if your plan would be that hopefully reduction in the opiate prescriptions would be an option as she's able to make further use of the CBD or THC compounds?

A: Yes. Absolutely. Transition. That's where my treatment goal and, you know, what I see in her future, sure.

Q: Okay. In your view, that would be a safe, or safer treatment plan in the sense that, you know, any medication is -- no medication is without risk? I say "safer" in that context -- that would be an improvement for her?

A: Yes. I think it would be much safer for her to wean, and we've seen good success with that, and she's a perfect patient for that. She would do very well.

B27–28 (NP Grady Dep. at 27–28).

[58] I.A.B. Decision at 12; *see* A062–63 (I.A.B. Hr'g Tr. at 57–58).

[59] I.A.B. Decision at 12–13.

[60] I.A.B. Decision at 13; A069–70 (I.A.B. Hr'g Tr. at 64–65).

14

necessary because Employer presented sufficient evidence on the issue of causation. Specifically, the IAB stated that "there is sufficient evidence that causation is genuinely at issue, as per [Employer's] Petition and Dr. Brokaw's opinion."[61]

The IAB then considered the merits of the case and held that Employer "met its burden of proof regarding the narcotic pain medications."[62] The IAB "accept[ed] Dr. Brokaw's opinion over [NP] Grady's opinions" because the IAB "[found] Dr. Brokaw's opinions [were] more persuasive as they [were] consistent with the facts of this case and [Sheppard's] condition."[63] Further, the IAB noted that "[NP] Grady was unaware of [Sheppard's] illegal use of marijuana for many years" which negatively impacted NP Grady's testimony because "she was either ignoring what [was] listed on the urine drug screen reports and turning a blind eye to it or she was misled by [Sheppard] into believing [Sheppard] had a valid medical marijuana card."[64]

The IAB also found that Sheppard was not credible because she initially denied using marijuana when asked by Dr. Brokaw.[65] Accordingly, the IAB concluded that the use of narcotics had not led to an improvement in her condition, and, therefore, it agreed with Dr. Brokaw's conclusion that Sheppard should be weaned off the narcotics.[66]

---

[61] I.A.B. Decision at 2.

[62] *Id.* at 13.

[63] *Id.* at 14.

[64] *Id.*

[65] *Id.* at 14–15.

[66] *Id.* at 15.

15

F.       *Sheppard's Appeal to the Superior Court*

Sheppard appealed to the Superior Court, arguing that her motion to dismiss should have been granted and the matter referred to the utilization review process under 19 *Del. C.* § 2322F(h). According to Sheppard, Employer challenged whether her treatment was reasonable and necessary, and, therefore, was required to submit the treatment in dispute to utilization review. Further, Sheppard argued that Employer's Petition, filed pursuant to 19 *Del. C.* § 2347, required Employer to prove a change in Sheppard's status. Sheppard argued that Employer failed to show such a change.

The Superior Court reviewed both Section 2322F(h) and Section 2347. It explained that when causation is at issue, utilization review is not available because under utilization review, the employer waives the right to contest causation. Therefore, because Employer wanted to argue causation, the Superior Court found that it was appropriate for the Employer to challenge Sheppard's ongoing treatment by submitting the Petition.

As for the question of whether Sheppard's medical services were necessary and reasonable, or whether the expenses incurred were casually related to Sheppard's Accident, the court concluded that these were "purely factual issues entirely within the purview of the Board."[67] Accordingly, adhering to the court's standard of review, the court affirmed the IAB's decision, concluding that the IAB's decision was "supported by substantial evidence" and "free from legal error."[68]

---

[67] *Sheppard v. Allen Fam. Foods*, 2021 WL 4453591, at *4 (Del. Super. Sept. 29, 2021).
[68] *Id.*

16

This appeal followed.

## II.    CONTENTIONS ON APPEAL

On appeal, Sheppard contends that the Board erred in denying her motion to dismiss because Employer lacked a good faith basis to challenge a change in condition or circumstance relating to the causal relationship of Sheppard's treatment following the Accident. She argues that there can be no such good faith basis because three separate events "conclusively established causation."[69]  First, Sheppard argues that Dr. Brokaw's opinion that Sheppard's Accident-related injuries should have resolved by 2012 is contrary to the law of the case because in 2014 the IAB found that Sheppard had established permanent impairments. Second, Sheppard argues that Employer conceded causation when it submitted to the utilization review process in 2016. Third, Sheppard contends that Employer conceded causation by continuing to pay for Sheppard's treatment from the time of the Accident in 2011 up to September 2019. As a result of these events, Sheppard argues that Employer had no legitimate factual basis to contest causation.

For the reasons explained below, we reject Sheppard's challenges.

## III.    SCOPE AND STANDARD OF REVIEW

"The review of an Industrial Accident Board's decision is limited to an examination of the record for errors of law and a determination of whether substantial evidence exists to support the Board's findings of fact and conclusions of law."[70]  "Substantial evidence is

---

[69] Reply Br. at 6.

[70] *Powell v. OTAC, Inc.*, 223 A.3d 864, 870 (Del. 2019) (citing *Roos Foods v. Guardado*, 152 A.3d 114, 118 (Del. 2016)).

17

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'[71]  "It is 'more than a scintilla but less than a preponderance of the evidence.'"[72]  "On appeal, this Court will not weigh the evidence, determine questions of credibility, or make its own factual findings."[73]  "In reviewing an appeal from a decision of the Board, this Court and the Superior Court must both determine whether the Board's decision is supported by substantial evidence and is free from legal error."[74]  "Weighing the evidence, determining the credibility of witnesses, and resolving any conflicts in the testimony are functions reserved exclusively for the Board."[75]  "Further, '[o]nly when there is no satisfactory proof to support a factual finding of the Board may the Superior Court or this Court overturn that finding.'"[76]

## IV.  ANALYSIS

Sheppard correctly observes that "[a]lthough [S]ection 2347 allows the Board to modify an award, it does not allow the Board to retroactively change an award."[77]  As this Court explained in *Betts v. Townsends*:[78]

> Under 19 *Del. C.* § 2347, the Board has statutory authority to review a prior agreement or award 'on the ground that the incapacity of the injured employee has subsequently terminated, increased, diminished or recurred or

---

[71] *Id.* (citing *Roos Foods*, 152 A.3d at 118).

[72] *Id.* (citing *Noel-Liszkiewicz v. La-Z-Boy*, 88 A.3d 188, 191 (Del. 2013)).

[73] *Id.* (citing *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009)).

[74] *Id.* (citing *Noel-Liszkiewicz*, 68 A.3d at 191).

[75] *Id.* (citing *Noel-Liszkiewicz*, 68 A.3d at 191).

[76] *Id.* (citing *Noel-Liszkiewicz*, 68 A.3d at 191).

[77] Opening Br. at 16.

[78] 765 A.2d 531 (Del. 2000).

that the status of the dependent has changed . . . .’ Where the Board is asked to reconsider the incapacity or status of a claimant based on one of these specifically delineated changes in circumstances, the doctrine of *res judicata* is inapplicable. . . . *Res judicata* would, however, prevent the Board from reviewing the correctness of a prior award.[79]

Thus, when the Board awards compensation, "it is not an adjudication as to the claimant's future condition and does not preclude subsequent awards or subsequent modifications of the original award."[80] "A contrary rule would render § 2347 meaningless."[81]

Dr. Brokaw's opinion is not a bar to the Petition even though he testified that he "would have expected all of the conditions that [were] casually related to the April 2011 injury to have gone back to preinjury status within a one year time period."[82] Dr. Brokaw provided expert testimony, given to a reasonable degree of medical certainty, that he "certainly [did not] correlate the need for ongoing treatment to the work injury of April

---

[79] *Id*. at 534 (citations omitted).

[80] *Shively v. Allied Systems Ltd.*, 2010 WL 537734, at *10 (Del. Super. Feb. 9, 2010) (quoting A.M. Swarthout, Annotation, *Res Judicata as Regards Decisions or Awards Under Workmen's Compensation Acts*, 122 A.L.R. 550), *aff'd* 998 A.2d 851, 2010 WL 2651602 (Del. July 1, 2010) (TABLE).

[81] *Id*. (citing *Harris v. Chrysler Corp.*, 541 A.2d 598, 1988 WL 44783, at *1 (Del. April 8, 1988) (TABLE) (stating that "the doctrine of *res judicata* is not a bar to the Board's exercise of its authority conferred by 19 *Del. C.* § 2347 to review, modify or terminate previous awards upon proof of subsequent change of condition")).

[82] B90 (Dr. Brokaw Dep. at 37). Dr. Brokaw testified as follows during his deposition:

> Q: When did it cease to be related to the work injury?
>
> A: Based on her mechanism of injury and the benign nature of her objective studies I would have expected all of the conditions that are causally related to the April 2011 injury to have gone back to preinjury status within a one year time period. As such she may have had appropriate treatment for a year, i.e., by the beginning of 2012. After that point her subjective symptoms do not correlate with her objective findings and the causal relationship is certainly questionable after that time period.

B90–91 (Dr. Brokaw Dep. at 37–38). The parties stipulated to his expert qualifications.

2011."[83] However, Employer was not submitting Brokaw's testimony to reverse or alter the IAB's prior decisions or to convince the IAB to retroactively terminate Sheppard's treatment or disability benefits.[84] Rather, Dr. Brokaw was merely giving his opinion regarding Sheppard's current objective findings and her subjective symptoms, and Employer was not attempting to relitigate the IAB's determination that Sheppard had a permanent injury at the time of the IAB hearing in 2014.[85]

In addition, Employer did not waive its ability to challenge causation in its Petition because it pursued utilization review in 2016. Utilization review is available for the prompt resolution of issues related to whether a claimant's treatment is in compliance with the health care payment system or practice guidelines for those claims that have been acknowledged as compensable.[86] Further, utilization review may be sought in order to

---

[83] B88–89 (Dr. Brokaw Dep. at 35–36).

[84] *See e.g.*, *Puckett v. Matrix Servs.*, 2013 WL 69234, at *2–3 (Del. Jan. 7, 2013) (finding that *res judicata* and collateral estoppel did not apply where the Board was not invalidating or revisiting the correctness of the prior award of temporary total disability benefits where the employee's second petition related to the separate issue of permanent partial disability).

[85] As Employer points out, "[n]o prior Board Decision exists addressing causation as to current treatment in the context of [Sheppard's] illegal marijuana use, evidence of dishonesty, or the transfer of opioid prescriptions from a medical doctor to a nurse practitioner." Answering Br. at 19.

[86] 19 Del. Admin. C. §1341-5.1; *see* 19 *Del. C.* § 2322F(h). In full, Section 2322F(h) entitled *Prompt pay required for nonpreauthorized* care provides:

> An employer or insurance carrier shall be required to pay a health care invoice within 30 days of receipt of the invoice as long as the claim contains substantially all the required data elements necessary to adjudicate the invoice, unless the invoice is contested in good faith. *If the contested invoice pertains to an acknowledged compensable claim and the denial is based upon compliance with the health care payment system and/or health care practice guidelines, it shall be referred to utilization review.* Any such referral to utilization review shall be made within 15 days of denial. Unpaid invoices shall incur interest at a rate of 1% per month

20

evaluate the quality, reasonableness, and necessity of proposed or provided healthcare services for acknowledged compensable claims.[87] Utilization review is to be utilized when causation is not at issue.[88] This is because the legislature intended to, among other things, streamline the method of payment of expenses "in cases where the employer does not dispute, i.e. 'acknowledges,' injury."[89]

By contrast, an employer's ability to challenge causation is set forth in Section 2347.[90] The plain language of Section 2347 does not prohibit an employer from seeking review under Section 2347 if the employer previously had sought to evaluate a claimant's treatment through the utilization review process. In this case, the utilization review in 2016 specifically challenged Dr. Dickinson's treatment of Sheppard and whether that treatment

---

payable to the provider. A provider shall not hold an employee liable for costs related to nondisputed services for a compensable injury and shall not bill or attempt to recover from the employee the difference between the provider's charge and the amount paid by the employer or insurance carrier on a compensable injury.

19 *Del. C.* § 2322F(h) (emphasis added).

[87] *Sheppard*, 2021 WL 4453591, at *4. *See* 19 *Del. C.* § 2322F(j).

[88] *See Poole v. State*, 77 A.3d 310, 311 (Del. Super. 2012) (noting that utilization review "would be available to employers and/or insurers for injuries which have been 'acknowledged' as compensable.").

[89] *Id.* at 320, 323 (referring to the language of Section 2322(F)(j), specifically, that "[t]he intended purpose of utilization review services shall be the prompt resolution of issues related to treatment and/or compliance with the health care payment system or practice guidelines for those claims which have been acknowledged to be compensable").

[90] 19 *Del. C.* § 2347. In pertinent part, Section 2347 provides:

On the application of any party in interest on the ground that the incapacity of the injured employee has subsequently terminated, increased, diminished or recurred or that the status of the dependent has changed, the Board may at any time, but not oftener than once in 6 months, review any agreement or award.

19 *Del. C.* § 2347.

was in compliance with the practice guidelines for Delaware's Health Care Payment System for workers' compensation. The utilization reviewer did not, and could not, consider whether Sheppard's condition as of the December 2, 2019 Petition was causally related to Sheppard's 2011 Accident. Therefore, the 2016 utilization review does not bar the Petition.

Finally, Employer's continued payment for Sheppard's treatment through September 4, 2019, does not translate into a waiver of causation with respect to the December 2019 Petition.[91] Permanent impairment awards do not serve as a permanent bar on challenges to future treatment,[92] and thus, Employer's continued payment of medical expenses through September 4, 2019, is not a permanent bar to its present Petition.[93]

Sheppard has framed her challenge primarily as a factual challenge to Employer's good faith basis for filing the Petition. Even Sheppard conceded before the Board that she

---

[91] Employer argues that its continued payment for Sheppard's treatment also does not imply an agreement but notes that Sheppard "does not cite it as such." Answering Br. at 16. Employer notes that Sheppard "did *not* raise a theory of implied agreement in this matter." *Id*. at 17 n.56 (emphasis in original). Our review of the record before us indicates that this theory was not raised in the proceedings below. Accordingly, it has been waived. Del. Sup. Ct. R. 8.

[92] *See e.g., Pekala v. E.I. DuPont De Nemours & Co.*, 2007 WL 1653496, at *1 (Del. Super. May 31, 2007) (affirming the Board's decision to deny the claimant's request for additional permanent impairment benefits based on claimant's continued medical conditions that were triggered by exposure to mold after claimant's employment had terminated); *Simmons v. Delaware State Hosp.*, 660 A.2d 384, 386 (Del. 1995) (affirming the Board's decision to terminate claimant's total disability benefit payments, and instead award claimant partial disability benefits and permanent impairment benefits).

[93] *See e.g., DeShields v. State*, 2004 WL 1551453, at *3 (Del. Super. June 15, 2004) (noting that "[t]he claimant's argument that the previous finding of a 5% permanent disability requires a finding in her favor under the doctrine of *res judicata* must also be rejected," and stating that "[t]he fact that a person is once found to have a 5% permanent disability to the low back does not mean that all future complaints of low back pain or proposed treatment for the low back are related to the 5% permanent disability").

22

was "not suggesting that, as a procedural matter, Employers cannot dispute medical treatment on a causation basis, via a petition for review."[94] Rather, her counsel argued that "the record of facts here [does] not support the necessary causation dispute, at least not on good faith, because of the record inconsistencies with the facts in this case."[95]

The Board, however, was satisfied as to the good faith basis for the causation challenge. The record supports that determination as it shows that there is substantial evidence to support the IAB's decision. Dr. Brokaw testified as a medical expert and disputed the causal relationship of Sheppard's ongoing treatment to her Accident, and he did so after reviewing her available records and personally examining her. The IAB, as the factfinder, determined that Dr. Brokaw's conclusions were more credible than NP Grady's, and that Sheppard was incredible. The Employer had new evidence of Sheppard's dishonesty with her doctors. For example, she lied about her illegal use of marijuana. She began receiving her treatment from a nurse practitioner only, and not a medical doctor, and the nurse practitioner was unaware of Sheppard's illegal use of marijuana. These facts, noted by the Board and the Superior Court, suffice to satisfy the good faith obligation sufficient to withstand Sheppard's motion to dismiss.

The IAB then properly addressed the merits of the case, and we find that it was not legally erroneous and that it was supported by substantial evidence, including expert medical testimony. Therefore, reversal of the Superior Court is not warranted.

---

[94] A034 (I.A.B. Hr'g Tr. at 29).

[95] *Id.*

23

## V.    CONCLUSION

Based on the foregoing, we hold that the IAB's decision is supported by substantial evidence, and therefore the decision of the Superior Court is **AFFIRMED**.